IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:20CR308 |
| vs. | |
| | FINDINGS AND RECOMMENDATION |
| KATHERINE L. WOITASZEWSKI, | |
| Defendant. | |

This matter is before the Court on Defendant Katherine Woitaszewski's Motion to Suppress. ([Filing No. 42](#).)  An evidentiary hearing was held on November 8, 2021.  A transcript has been filed and this matter is now ripe for disposition.  For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

On October 28, 2020, U.S. Deputy Marshal Daniel Potter ("Deputy Marshal Potter") became involved in an investigation involving Defendant.  (TR. 88.)  Deputy Marshal Potter has been a U.S. Marshal for eighteen and a half years and is assigned as the enforcement coordinator for the Marshals' fugitive task force.  (TR. 88.)  Deputy Marshal Potter received a phone call from a confidential informant ("CI") who provided information regarding a wanted fugitive and a potential escape plot.  (TR. 88.)  Deputy Marshal Potter testified that the CI told him there was a female named "Kate," whose last name was unknown but started with a "W" and was hard to pronounce, and that this individual had multiple warrants and was attempting to help someone escape from a camp in Leavenworth.  (TR. 88.)  Based on the information he received from the CI, Deputy Marshal Potter believed there was an active attempt to break someone out of federal custody in Leavenworth, Kansas.  (TR. 90.)

Deputy Marshal Potter then began the process of trying to identify "Kate." (TR. 88.) He contacted the U.S. Marshals out of Southern Iowa and the Pottawattamie County jail and was able to locate an individual named Katherine Woitaszewski—the defendant in this case. (TR. 89.) Deputy Marshal Potter got a picture of Defendant and showed it to the CI who confirmed Defendant was "Kate." (TR. 89.) Deputy Marshal Potter learned Defendant had four active warrants for her arrest, one of them being from Southern Iowa. (TR. 89; Exs. 12-15.)

Throughout the day on October 28th, Deputy Marshal Potter was continually in contact with the CI receiving updates, and it was his impression that the CI was with Defendant. (TR. 90.) The CI told Deputy Marshal Potter that Defendant was trying to obtain a rental vehicle to drive to Leavenworth the next morning to help Henry Poteet ("Poteet") escape from a USP Leavenworth camp. (TR. 90-91.) Deputy Marshal Potter was able to audio-record a call Defendant made to Poteet. (TR. 92; Exs. 5 and 6.) Deputy Marshal Potter testified that based on what the CI was telling him, it was his understanding that Defendant was having trouble finding a vehicle to drive to Kansas. (TR. 92.) Deputy Marshal Potter testified that Defendant wanted to use the CI's vehicle, which was not going to happen, and then she was trying to involve another individual to get a car, and that attempt also failed. (TR. 92.) Around dinnertime on October 28th, Deputy Marshal Potter was able to speak to Defendant. (TR. 92.) He attempted to play a ruse on her where he posed as a friend of the CI who could potentially get her a vehicle. (TR. 92.)

When Defendant unsuccessfully attempted to have another individual rent a vehicle, Deputy Marshal Potter contacted the Omaha Police Department dispatch, who put him in touch with Omaha Police Officer Michael J. Meyer ("Office Meyer") and his partner, Officer Korth.[1] (TR. 56; TR. 94.) Deputy Marshal Potter testified he contacted dispatch so officers could conduct a traffic stop and protect the identity of the CI. (TR. 94.) The CI had told Deputy Marshal Potter that Defendant would be a passenger in a black, Ford F-350 pickup with the CI in Omaha, Nebraska near the airport. (TR. 91.) Deputy Marshal Potter testified he wanted the truck stopped because Defendant had active felony warrants and he wanted to foil the escape plot. (TR. 91.)

---

[1] Officer Meyer testified that he has worked as a uniform patrol officer for the City of Omaha for approximately thirty years. (TR. 56-57.) Officer Meyer testified he has conducted hundreds of traffic stops over his career. (TR. 58.) Officer Meyer testified that traffic stops for vehicles that do not have license plates generally take ten to fifteen minutes. (TR. 58.)

Officer Meyer testified he received a radio call to meet Deputy Marshal Potter on October 28th. (TR. 88.) Officer Meyer stated Deputy Marshal Potter wanted Officer Meyer to conduct a traffic stop on a wanted party. (TR. 59.) Officer Meyer testified he and Officer Korth met Deputy Marshal Potter in a parking lot located across from the parking lot at Eppley Airfield. (TR. 59.) There, Deputy Marshal Potter provided the officers a briefing of his investigation. (TR. 94.) Officer Meyer testified that Deputy Marshal Potter told him that he was in communication with a CI who said there was a wanted person named "Katherine" inside a vehicle at the airport. (TR. 59; TR. 61-62.) Officer Meyer testified the CI had indicated to Deputy Marshal Potter that Defendant could be trying to get a rental car. (TR. 59; TR. 61-62.) Deputy Marshal Potter told Officer Meyer that Defendant had active warrants and needed to be taken into custody and Deputy Marshal Potter was trying to foil an escape plot.[2] (TR. 59, TR. 94.) Deputy Marshal Potter told Officer Meyer that Defendant was in a big, black truck and would be with a CI. (TR. 60.) Officer Meyer testified that Deputy Marshal Potter briefly showed him a photograph of Defendant. (TR. 60.) Officer Meyer testified he had never met Defendant before and did not have any ability to identify her on his own. (TR. 60.)

Deputy Marshal Potter testified that the officers devised a plan that once the truck left the airport area, they would conduct a traffic stop because the truck did not have a license plate on the rear bumper. (TR. 94.) Officer Meyer testified that after meeting with Deputy Marshal Potter, Officer Meyer and Officer Korth (who were riding in the same vehicle), waited in the parking lot. (TR. 59, TR. 60.) Deputy Marshal Potter went to a different location. (TR. 61.) After approximately ten to fifteen minutes, Officers Meyer and Korth saw a truck that matched the description provided by Deputy Marshal Potter traveling south on Abbott Drive. (TR. 61-62.) Officer Meyer testified he then pulled out onto Abbott Drive and conducted a traffic stop of the truck just north of Locust Street along Abbott Drive. (TR. 61-62.) This area is within the Northeast Precinct that Officer Meyer routinely patrols. (TR. 63.) Officer Meyer testified the probable cause for the traffic stop was that the truck did not have license plates. (TR. 75.) Officer Meyer acknowledged that the truck was also pulled over because they believed Defendant was in the truck. (TR. 75.) Officer Meyer stated he did not know for certain if Defendant was in the truck.

---

[2] Officer Meyer testified Deputy Marshal Potter told him Katherine's last name, but at the hearing, Officer Meyer could only recall that the individual's last name started with a "W." (TR. 59-60.)

(TR. 76.) Officer Meyer was wearing a body camera at the time which captured the traffic stop. (TR. 63.) Officer Korth was also wearing an operational body camera. (TR. 63.)

Once the truck was stopped, Officer Meyer approached the male driver and asked for his license, registration, and insurance. (TR. 64.) Officer Meyer testified he observed a female passenger but did not speak to her at that time. (TR. 64.) Officer Meyer testified he believed the female was Defendant and that the male driver was the CI. (TR. 64.) Officer Meyer stated the passenger looked like the individual in the photograph that Deputy Marshal Potter had shown him. (TR. 78.)

The officers then returned to their patrol car and discussed how they should go about identifying Defendant. (TR. 65.) Officer Meyer testified that one of the primary objectives of the traffic stop was to identify Defendant and he and Officer Korth were trying to come up with investigative strategies to do so. (TR. 66-67.) Officer Meyer testified it was difficult to identify her. (TR. 84.) Officer Meyer stated he did not want to disclose his suspicion that Defendant was wanted on a warrant because he did not know much about Deputy Marshal Potter's investigation and did not want to jeopardize it. (TR. 65.) Officer Meyer testified he did not believe he had a reason to ask Defendant her name at that time because Officer Korth told him Defendant was wearing her seat belt and was just looking at her phone. (TR. 66.) Officer Meyer also stated that the fact that the driver was a CI was a consideration, so he was trying to use the means available to positively identify Defendant and try to save the CI. (TR. 72, TR. 79.)

Officer Meyer testified that Officer Korth ran the driver's license through the computer, but the computer was slow. (TR. 68-69.) The officers did not run it over the radio. (TR. 69.) The officers discussed telling the driver that he had a suspended license so they could get the passenger's identification. (TR. 68.) The officers also discussed telling the driver he had a warrant for his arrest. (TR. 70.) Officer Meyer testified that to his knowledge, the driver did not have a warrant. (TR. 70.)

Following their conversation in the patrol car, the officers returned to the truck and told the driver that his license was suspended. (TR. 71.) Officer Meyer then asked Defendant if she had a license and asked her for her first name. (TR. 69.) Officer Meyer told Defendant she looked familiar and asked whether she worked at Subway. (TR. 82.) Defendant told Officer Meyer her

4

name was Cassie. (TR. 69.) Defendant indicted she did not have a driver's license. (TR. 75.) Officer Meyer did not ask Defendant her last name or date of birth. (TR. 69.)

The officers then returned to the patrol car again and Officer Meyer called Deputy Marshal Potter and explained the dilemma in identifying Defendant. (TR. 66-67.) Deputy Marshal Potter testified he was in communication with Officers Meyer and Korth by phone during the traffic stop. (TR. 95.) When Officer Meyer called him on this occasion, Deputy Marshal Potter told him that he was right behind him. (TR. 66.) Deputy Marshal Potter testified he went to the scene of the stop to positively identify Defendant. (TR. 95.) The officers, including Deputy Marshal Potter, then approached the truck together. (TR. 66.) Officer Korth went to the passenger side and Deputy Marshal Potter and Officer Meyer went to the driver's side. (TR. 66.) At that time, Deputy Marshal Potter peeked inside the truck and identified "Cassie" as Defendant. (TR. 66.) Deputy Marshal Potter went around to the passenger side of the truck, removed Defendant from the truck, and placed her in handcuffs. (TR. 66; Ex. 1.) Deputy Marshal Potter testified a female officer was called to the scene to conduct a pat-down search and Defendant was placed in the back of Officer Meyer's patrol car. (TR. 72, TR. 97; Ex. 1.) Officer Meyer testified that approximately ten to fifteen minutes passed between the time of the stop and Deputy Marshal Potter's arrival on the scene. (TR. 79.) The cruiser camera footage shows that the stop, measured from when the truck is stopped to the point Defendant was placed in handcuffs, lasted approximately eighteen minutes.

Officer Meyer testified that neither he nor Officer Korth provided Defendant with a *Miranda* advisement. (TR. 78.) Deputy Marshal Potter testified he did not provide Defendant with a *Miranda* warning because he was not asking her any questions. (TR. 96.) Deputy Marshal Potter testified he did not have any intention to interview Defendant on the side of the road and had previously had conversations with the DEA about an interview. (TR. 96-97.) Deputy Marshal Potter testified the DEA had an active investigation involving a drug cartel member and the DEA knew Defendant was an associate of the cartel member. (TR. 96-97.) The DEA planned to conduct a *Mirandized* interview with Defendant at the jail, which it did. (TR. 96-97.) Deputy Marshal Potter testified he did not have a reason to interview Defendant at the scene of the traffic stop because his goal was to foil the escape plot and take Defendant into custody on her warrants. (TR. 97.) Deputy Marshal Potter acknowledged that he did ask her when she came out of the truck if

5

she had any weapons or something that was going to stick or poke him for officer safety, which Deputy Marshal Potter said are routine questions. (TR. 96.)

Deputy Marshal Potter testified that after Defendant was placed in the patrol car, another officer told him that Defendant wanted to speak to him. (TR. 97.) Deputy Marshal Potter told the officer he did not need to speak to Defendant, but at some point, he went to see what she wanted and encouraged her to just talk at the jail. (TR. 97-98.) Deputy Marshal Potter testified that it was his perception that Defendant wanted to speak immediately, and Defendant told him she had a pistol in the truck in a purple Eddie Bauer backpack. (TR. 98.) She also told Deputy Marshal Potter that she did not want the CI, who was a convicted felon, to get in trouble for possessing a weapon. (TR. 98.) Deputy Marshal Potter testified his conversation with Defendant did not last more than a minute. (TR. 99.) Deputy Marshal Potter said he did not threaten Defendant or make her any promises. (TR. 99.) Deputy Marshal Potter testified he did not induce Defendant to tell him these things and that Defendant did it on her own. (TR. 99.)

Deputy Marshal Potter then returned to the truck observed a backpack on the floorboard. (TR. 98.) Deputy Marshal Potter testified Defendant said the backpack belonged to her, so the officers looked in the backpack as a search incident to arrest. (TR. 98-99.) The officers found a firearm, ammunition, drugs, and drug paraphernalia in the backpack. (TR. 99.) Defendant was then transported to the Douglas County jail by Omaha police officers and Deputy Marshal Potter followed. (TR. 99.)

## DISCUSSION

Defendant argues the evidence obtained from the traffic stop should be suppressed because the stop was unconstitutionally prolonged so other officers could get to the scene of the traffic stop to identify her. The undersigned finds the evidence should not be suppressed.[3]

**1.    Probable Cause for Traffic Stop**

Officers had a constitutionally permissible basis to stop the truck for several reasons.

---

[3] Defendant also argued the traffic stop did not occur in Nebraska but actually occurred in Iowa. Officer Meyer testified at the evidentiary hearing that he routinely patrols this area and the stop occurred in Nebraska. (TR. 62-63; Exs. 7-11.) After Officer Meyer's testimony, Defendant did not argue this point further. Based on Officer Meyer's testimony, and the other evidence of record, the undersigned finds the stop occurred in Nebraska.

It is well-established that a "police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Gadson*, 670 F. App'x 907, 908 (8th Cir. 2016) (quotation omitted). "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). Here, there were no license plates on the truck, which is a traffic violation and therefore provided probable cause for the stop. *See* Neb. Rev. Stat. § 60-399. The fact that officers were investigating an escape plot and that the traffic stop was in furtherance of that investigation makes no difference in this analysis because the reason for the stop was valid.

Moreover, there was reasonable suspicion for the stop because Officers Meyer and Korth had reliable information Defendant was involved in an escape plot and had warrants out for her arrest. Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell,* 183 F.3d 746, 749 (8th Cir. 1999). "There is no requirement that there be a traffic violation." *United States v. Jacobsen*, 391 F.3d 904, 905 (8th Cir. 2004). "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)).

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).

7

In justifying an investigative detention, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation." *United States v. Ortiz–Monroy,* 332 F.3d 525, 529 (8th Cir. 2003). *See also United States v. Edwards,* 891 F.3d 708, 711–12 (8th Cir. 2018) ("[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication"). An officer may become a member of an investigation team when he is instructed to conduct a traffic stop even if he does not possess "all the relevant collective knowledge of the team." *United States v. Robinson,* 664 F.3d 701, 704 (8th Cir. 2011).

Deputy Marshal Potter had detailed, reliable information that Defendant had warrants out for her arrest and was involved in a plot to help Poteet escape from a federal facility in Leavenworth, Kansas. The CI told Deputy Marshal Potter that Defendant was trying to obtain a rental vehicle to drive to Leavenworth the next morning to help Poteet escape. The CI, who was continually in contact with Deputy Marshal Potter on October 28th, told Deputy Marshal Potter that Defendant would be a passenger in a black, Ford F-350 pickup with the CI that evening in Omaha, Nebraska near the airport. Deputy Marshal Potter spoke to Officers Meyer and Korth and provided them a briefing of the situation and asked them to perform a traffic stop. Deputy Marshal Potter told Officers Meyer and Korth he was in communication with a CI who said there was a wanted person named "Katherine" inside a vehicle at the airport. Deputy Marshal Potter told them that Defendant had active warrants and needed to be taken into custody and Deputy Marshal Potter was trying to foil an escape plot. Deputy Marshal Potter provided them with a description of the truck and told them Defendant would be with a CI. Deputy Marshal Potter also briefly showed them a photograph of Defendant. This information provided officers reasonable suspicion to stop the vehicle.

### 2.     Duration of the Stop

"An officer may detain the occupants of a vehicle while completing routine tasks related to the traffic violation, such as asking for license and registration or inquiring about the occupants' destination, route, and purpose." *United States v. Chartier,* 772 F.3d 539, 543 (8th Cir. 2014). However, once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the

8

necessary reasonable suspicion to justify a further detention. *See United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). "A delay that prolongs—*i.e.*, adds time to—the stop . . . to conduct investigatory actions unrelated to the purposes of the stop is impermissible unless it is supported by reasonable suspicion." *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020) (internal quotation and citation omitted).

An investigative *Terry* stop must also be limited in scope and duration. *See Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004). "The officer's action must be justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. (quotation omitted). "[T]he seizure cannot continue for an excessive period of time or resemble a traditional arrest." *Id*. at 185-86. In determining whether an investigatory detention is reasonable, courts consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id*. at 686.

Here, the totality of the circumstances shows officers had reasonable suspicion to detain Defendant. The stop was limited in scope and the duration of the stop was reasonable because the officers diligently pursued a means of investigation to identify Defendant. Deputy Marshal Potter had information from a CI that Defendant was involved in a plot to help Poteet escape from Leavenworth. Defendant also had active arrest warrants. This information was communicated to Officers Meyer and Korth and they were directed to conduct a traffic stop to identify Defendant. Once the traffic stop was initiated, Officer Meyer and Officer Korth engaged in conversation in the patrol car to devise investigative strategies to identify Defendant. The officers were not attempting to prolong the investigation but were instead trying to figure out the best way to identify Defendant without compromising the CI. Officer Meyer also stated he did not want to disclose his suspicion that Defendant was wanted on a warrant because he did not know much about Deputy Marshal Potter's investigation and did not want to jeopardize it. Following some discussion with Officer Korth, Officer Meyer asked Defendant if she had a license and asked her for her first name. Defendant told Officer Meyer her name was Cassie and indicted she did not have a driver's license. Thus, the officers' ability to identify Defendant was hindered and delayed by Defendant's own actions. Once Deputy Marshal Potter arrived on the scene approximately two minutes later, he

was able to positively identify Defendant and take her into custody. The stop, which in its totality lasted eighteen minutes until Defendant was arrested, was not unreasonably prolonged.

### 3. Statements and Consent to Search

Defendant argues the roadside questioning during the traffic stop violated her *Miranda* rights. Under *Miranda v. Arizona,* 384 U.S. 436, 484 (1966), certain warnings must be given when a suspect is in custody and subject to interrogation by law enforcement officials. *United States v. Elzahabi,* 557 F.3d 879, 883 (8th Cir. 2009). Interrogation occurs when an officer's interaction with the suspect is "likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). "Interrogation includes not only express questioning by an officer, but also any words or actions that police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Ochoa–Gonzalez,* 598 F.3d 1033, 1038 (8th Cir. 2010).

"Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *United States v. Bailey,* 831 F.3d 1035, 1038 (8th Cir. 2016). "In most cases where an officer responds to a defendant's question, his response does not amount to an interrogation." *United States v. Smialek,* 970 F.3d 1070, 1073 (8th Cir. 2020). Further, "statements made in response to a law enforcement officer's attempt to seek clarification of a defendant's remarks, during an interview requested by the defendant, are not the products of interrogation." *United States v. Koontz,* 143 F.3d 408, 411 (8th Cir. 1998).

Here, there is no dispute that Defendant was in custody after she was removed from the truck and she was not advised of her *Miranda* rights. The issue is whether Defendant was interrogated by officers. The evidence shows she was not. Defendant's statements regarding a gun, ammunition, scale, bong, and marijuana stem being in the truck were not the product of interrogation and were entirely voluntary.

When Defendant was removed from the truck, she was asked whether she had anything on her that could hurt the officers, which is a routine question and not meant to elicit an incriminating response.[4] After that, she was placed in the patrol car and the officers did not ask her additional

---

[4] An officer need not advise a suspect of his *Miranda* rights before asking limited questions to determine whether officers are likely to encounter items that might pose a danger to themselves or others. *See United States v. Liddell,* 517 F.3d 1007, 1010 (8th Cir. 2008).

10

questions other than her name and date of birth to run a data check. Defendant later initiated conversations with the officers by asking several times to speak to Deputy Marshal Potter. (Ex. 1-4.) Deputy Marshal Potter initially declined to speak to Defendant, but when Defendant was being placed back in the patrol car after being searched by a female officer, she asked Deputy Marshal Potter if she could talk to him. (Ex. 1.) Defendant told Deputy Marshal Potter that she had a problem and he told her they could talk at the jail, but Defendant told Deputy Marshal Potter that she needed to talk to him now. (Ex. 1.)

Deputy Marshal Potter asked why she needed to talk to him now and Defendant told Deputy Marshal Potter that there was "stuff" in the truck that did not belong to the driver. (Ex. 1.) Deputy Marshal Potter and Defendant engaged in a conversation regarding what was in the truck. Defendant indicated there was ammunition in the truck. (Ex. 1.) She said she did not want the driver to get in trouble for the gun and ammunition because he was a convicted felon. (Ex. 1.) Defendant further told Deputy Marshal Potter that there was a bong, marijuana stem, and a scale in the truck. (Ex. 1.) Defendant went on to tell Deputy Marshal Potter that the pistol was in her purple Eddie Bauer backpack in the truck. (Ex. 1.) When the officers looked in the backpack, they found the gun and some methamphetamine, but they did not find any ammunition. Officers clarified with Defendant where the ammunition was, and Defendant told the officers that the ammunition was in a black leather case behind the toolbox in the bed of the truck. (Ex. 1.)

Later, an officer standing at Officer Meyer's driver's door started filling Officer Meyer in on what the officers had found and that there may be additional charges based on additional drugs being found. (Ex. 1.) Having overheard this conversation, Defendant started asking questions as to where the drugs were found. (Ex. 1.) The officer that was talking to Officer Meyer went over and opened Defendant's door to ask her what she was asking because he could not hear her. (Ex. 1.) Defendant asked the officer where the drugs were found, and the officer told her. (Ex. 1.) At that point, Defendant made additional voluntary statements in response to what the officer told her. (Ex. 1.)

At the evidentiary hearing, Deputy Marshal Potter credibly testified he did not have any intention or reason to interview Defendant on the side of the road because his goal was to arrest Defendant on her warrants and stop an escape attempt. Deputy Marshal Potter said he knew the DEA planned to conduct a *Mirandized* interview with Defendant at the jail.

Having considered all the evidence submitted in connection with this matter, including the testimony at the evidentiary hearing, the undersigned finds the record shows Defendant was not interrogated at the scene of the traffic stop. The officers' comments to Defendant were simply attempts to clarify Defendant's statement that there was "stuff" in the truck. Defendant's statements regarding a gun, ammunition, scale, bong and marijuana stem being in the truck occurred during a conversation that she requested on several occasions and were not the product of interrogation. Rather, Defendant's conversations with officers about items in the truck occurred because the conversations were initiated by Defendant or were to clarify information voluntarily provided by Defendant. The officers were not attempting to elicit incriminating responses. Deputy Marshal Potter credibly testified he did not have any reason to do so because he was aware Defendant was going to have a *Mirandized* interview with the DEA. Further, Deputy Marshal Potter tried to get Defendant to not talk to him at the scene but wait until they got down to the jail. The record before the Court shows Defendant's *Miranda* rights were not violated.

Further, there is also no indication that Defendant's statements were involuntary. "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Kilgore,* 58 F.3d 350, 353 (8th Cir. 1995) (internal quotation omitted). In assessing voluntariness, courts look at the totality of the circumstances, including not only the conduct of the police, but also the defendant's ability to resist police pressure. *United States v. Pierce,* 152 F.3d 808, 812 (8th Cir.1998). In evaluating the totality of the circumstances, courts also consider the defendant's maturity level, education, physical condition, and mental condition. *United States v. Sanchez,* 614 F.3d 876, 883 (8th Cir. 2010).

The officers did not threaten Defendant or make any promises. Deputy Marshal Potter did not induce Defendant to speak to him or other officers. Defendant initiated the conversation with

12

Deputy Marshal Potter seemingly because she wanted to prevent the CI from getting in trouble for the firearm and ammunition that was hers. Also, Deputy Marshal Potter's conversation with Defendant was very brief. It only lasted approximately two and-a-half minutes. Defendant's statements to the other officers were likewise voluntary and not the result of threats or promises. At one point, having overheard the officers speaking, Defendant initiated a conversation with officers and asked them questions about where the drugs were found. There is no evidence Defendant lacked the maturity, education, physical condition, or mental condition to resist any perceived police pressure or to stop speaking with officers. Defendant is also a convicted felon and thus familiar with the criminal justice system and experienced in interactions with law enforcement. Defendant's statements were entirely voluntary.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 42) be denied.

Dated this 6th day of January, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.